# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 20-269V
UNPUBLISHED

| | |
|---|---|
| BECKY BRIGHT,<br><br>　　　　　　　　　Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>　　　　　　　　　Respondent. | Chief Special Master Corcoran<br><br>Filed: June 20, 2025 |

*Jonathan J. Svitak, Shannon Law Group, P.C., Woodridge, IL,* for Petitioner.

*Tyler King, U.S. Department of Justice, Washington, DC,* for Respondent.

### RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES[1]

On March 11, 2020, Becky Bright filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"), alleging that she suffered a left shoulder injury related to vaccine administration ("SIRVA"), as defined in the Vaccine Injury Table, after receiving an influenza ("flu") vaccine. Petition at 1 (ECF No. 1). The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

For the reasons described below, and after holding a "Motions Day" hearing on entitlement and damages, I find that Petitioner is entitled to compensation, and I award damages in the amount of **$105,000.00**, **representing actual pain and suffering, plus**

---

[1] Although I have not formally designated this Decision for publication, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002, because it contains a reasoned explanation for my determination. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

**$2,499.78 for out-of-pocket unreimbursed expenses, for a total award of $107,499.78.**

I.   **Relevant Procedural History**

This case was activated from "pre-assignment review" on April 7, 2021. (ECF No. 19). On September 30, 2022, Respondent filed his Rule 4(c) Report opposing entitlement. Thereafter, on May 16, 2023, Petitioner filed a Motion for Ruling on the Record and Brief in Support of Damages ("Mot."). (ECF No. 37). On July 24, 2023, Respondent filed his Response to Petitioner's motion ("Resp."). (ECF No. 38). Petitioner filed a supplemental brief ("Reply") on September 21, 2023. (ECF No. 39).

I proposed this case for an expedited hearing on May 30, 2025, at which time I would decide the disputed issues based on all evidence filed to date and any oral argument from counsel. (ECF No. 41). The parties agreed, and the "Motions Day" hearing took place as scheduled. During the hearing, I orally ruled on Petitioner's entitlement to compensation, and then made an oral damages determination. This Decision memorializes those findings and determinations.

II.   **Relevant Factual History**

On September 27, 2018, Petitioner received flu and pneumococcal vaccines in her right deltoid, and a tetanus-diphtheria-acellular pertussis vaccine in her left deltoid. Ex. 11 at 3; Ex. 10 at 4-5, 9. At the time of vaccination, Petitioner was a fifty-year-old female employed as an occupational health nurse. Ex. 1 at 1. She had a prior medical history of cervical spine pain and degeneration. Ex. 3 at 15. No history of right shoulder pain or injury was reported.

On November 26, 2018 (sixty days after the vaccination), Petitioner saw her primary care provider ("PCP"), Robert Taylor, M.D., reporting pain in her right deltoid. Ex. 3 at 10. Petitioner complained that she was still experiencing pain after receiving a pneumococcal vaccine in September in her right deltoid. *Id.* On December 12, 2018, Petitioner was examined by Dr. Taylor. Ex. 3 at 9. In his report, Dr. Taylor noted, "[R]echeck R deltoid." *Id.*

On January 7, 2019, Petitioner saw orthopedist Howard Miller, M.D., for right shoulder pain. Ex. 4 at 17. In the medical record, Dr. Miller recorded that toward the end of October Petitioner received "some vaccinations, a flu pneumonia shot on the right side and another vaccination on the left side." *Id.* She noted that her right shoulder remained sore after these injections, and she had reportedly developed muscle spasms and pain that were particularly bothersome at night. *Id.* Petitioner tried to relieve her shoulder pain

2

with a Medrol Pak but did not feel any improvement. *Id.* Physical examination revealed Petitioner had good strength but positive impingement signs. *Id.* at 18. X-rays of Petitioner's shoulder revealed no abnormalities. *Id.* Dr. Miller's assessment was that Petitioner had "fairly classical impingement tendonitis." *Id.* However, he was "not able to relate how it is connected to the injection that she had." *Id.* An MRI of the shoulder was ordered, and Petitioner was referred to physical therapy.

On January 14, 2019, Petitioner began physical therapy ("PT") for right shoulder pain, reporting symptoms since her pneumococcal vaccination in September 2018. Ex. 8 at 139. Physical examination revealed range of motion ("ROM") within functional limits with minor strength deficits. *Id.* On January 23, 2019, Petitioner underwent an MRI of her right shoulder. Ex. 5 at 1. Imaging revealed osteophytes on the AC joint that slightly impinged the supraspinatus tendon. *Id.* Moderate thickening of the supraspinatus tendon due to tendinitis, a small tear of the insertion of the supraspinatus tendon, and mild to moderate fluid in the subacromial/subdeltoid bursa were also revealed. Id.

On January 28, 2019, Petitioner went back to Dr. Taylor. Ex. 3 at 9. The handwritten documentation from this appointment was illegible. Petitioner attended a total of six PT appointments between January 16, 2019, and January 30, 2019. Ex. 8 at 119, 121, 123, 127, 128, and 130. Initially, she reported soreness in her right shoulder. Id. at 119, 121, and 127. At her last session, on January 30, 2019, Petitioner complained of a "small amount of pain and soreness." Id. at 123. Donna McClendon, PTA, noted that petitioner had increased ROM but still had some soreness in the right shoulder. Id. After seven total sessions of PT, the assessment was that Petitioner was progressing. Id. at 124.

On February 4, 2019, Petitioner was examined by Dr. Miller for right shoulder pain. Ex. 4 at 9. The impression noted a history of arthritis in the right shoulder. Id. at 10. Following a physical examination, Petitioner was diagnosed with right rotator cuff tear ("RTC") and impingement tendonitis. Id. Dr. Miller discussed treatment options with petitioner, and she elected to proceed with surgical repair. Id.

On March 21, 2019, Petitioner underwent an arthroscopic right RTC repair, subacromial acromioplasty, bursectomy, and distal clavicle resection. Ex. 6 at 29-30. On April 3, 2019, six months post-vaccination, Petitioner returned to Dr. Miller for a two-week postoperative visit. Ex. 4, vol. 2 at 16. Physical examination revealed well healing wounds with mild edema noted around the shoulder. Id. at 17. Petitioner was instructed to begin PT and return for a follow-up with Dr. Miller in four weeks. Id.

Between April 8, 2019, and May 6, 2019, Petitioner completed ten sessions of PT. Ex. 8 at 40-74. At her first session, on April 8, 2019, Petitioner reported difficulty with

3

reaching, grabbing, and sleeping on her right shoulder. Id. at 74. On May 6, 2019, Petitioner returned to Dr. Miller for her six-week postoperative visit. Ex. 4 vol. 2 at 13. Petitioner reported gradual improvement with soreness in the shoulder. Id. She also described using her right shoulder for everyday activities. Id. Physical examination revealed moderate ROM restrictions. Id. Dr. Miller noted that Petitioner was progressing well. Id. at 14. Petitioner was instructed to continue with her at home PT exercises and follow up with Dr. Miller in two months. Id.

Between May 8, 2019, and June 13, 2019, Petitioner completed ten sessions of PT. Ex. 8 at 2-40. At petitioner's last session on June 13, 2019, Petitioner reported that she was doing well with strengthening and self-stretching. Id. at 2. After twenty total sessions of PT post-surgery, petitioner reported not having pain in her right shoulder and upon examination her passive ROM was within normal limits. Id.

On July 8, 2019, nine months post-vaccination, Petitioner returned to Dr. Miller for a three-month postoperative visit. Ex. 4 vol. 2 at 10. Petitioner was doing quite well and improving every week. Id. She reported occasional soreness but was using the arm for everyday activities. Id. Physical examination revealed excellent strength and full ROM in the right shoulder. Id. at 11.

### III. Factual Findings and Ruling on Entitlement

#### A. Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must demonstrate, by a preponderance of evidence, all matters required under Section 11(c)(1), including the factual circumstances surrounding his claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). Contemporaneous medical records are presumed to be accurate. *See Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Hum. Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed.

4

Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Hum. Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).

In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[3] a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying QAI are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time frame;

---

[3] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of his injury for more than six months, died from his injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. *See* Section 11(c)(1)(A)(B)(D)(E).

5

>   (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
>
>   (iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10) (2017).

### B. Factual Finding Regarding QAI Criteria for Table SIRVA

The only Table requirement for SIRVA that Respondent contests is the second criterion - whether the onset of Petitioner's pain occurred within 48 hours of vaccination. Response at 6; see 42 C.F.R. § 100.3(c)(10)(ii); see also 42 C.F.R. § 100.3(a)(XIV)(B) (requiring the first symptom or manifestation of onset within 48 hours of vaccination for a SIRVA injury following receipt of a flu vaccine). Respondent argues that Petitioner's delayed initial presentation of sixty days, along with vague onset references, are not enough to establish that pain began within 48 hours of vaccination. Id.

Notwithstanding Respondent's objection, I find that the delay in question is not facially unreasonable, especially in comparison to what has characterized the course of seeking treatment for many other successful claims. And it is frequently observed in SIRVA cases that claimants expect any post-vaccination pain to be transient, or not serious enough to merit evaluation by a medical professional. I also note that at the time period in question, Petitioner was employed as a nurse and Petitioner stated in an affidavit that she believed she could self-treat her shoulder. Ex. 12 at ¶ 6. Once it became clear to Petitioner that her efforts were not having the desired effect, she made an appointment with her PCP to address her ongoing shoulder issues. Overall, the delay in seeking treatment is not long enough to merit a finding that the onset of her symptoms was in the appropriate time frame.

Otherwise, the record contains sufficient evidence showing Petitioner has satisfied the other QAI criteria. See 42 C.F.R. § 100.3(c)(10)(i) & (iii)-(iv). A thorough review of the record in this case does not reveal either a prior or current condition, pain and limited range of motion ("ROM") other than in Petitioner's injured left shoulder, and no other condition or abnormality which would explain Petitioner's symptoms. Petitioner's medical records consistently reflect her reporting immediate shoulder pain post-vaccination. Thus, and as I stated during the expedited hearing, all elements of a Table SIRVA claim have been preponderantly established.

### C. Other Requirements for Entitlement

Because Petitioner has satisfied the requirements of a Table SIRVA, she need not prove causation. Section 11(c)(1)(C). However, she must satisfy the other requirements of Section 11(c) regarding the vaccination received, the duration and severity of her injury, and the lack of other award or settlement. Section 11(c)(A), (B), and (D). In this case, Respondent has not offered any argument to suggest that Petitioner has failed to meet these other requirements, and my review of the record confirms that Petitioner has preponderantly established that Petitioner suffered the residual effects of her SIRVA for more than six months and that there has been no other award or settlement. Accordingly, Petitioner is entitled to compensation for her SIRVA.

## IV. Compensation to be Awarded

### A. Parties Arguments

Prior to oral argument, the parties submitted that they had agreed on an amount to be awarded for Petitioner's out-of-pocket unreimbursed expenses. Therefore, the only issue of contention remaining is what amount of past pain and suffering to award.

Petitioner seeks $125,000.00 for pain and suffering, maintaining that her treatment involved multiple doctor's appointments, an MRI, 27 physical therapy sessions, and one surgery, and that she still experiences mild sequela of her SIRVA injury to this day. Br. at 26-27. She favorably compares the facts and circumstances in her case to those experienced by the petitioner in *Kestner,* who was awarded $115,000.00 for past pain and suffering.[4] *Id.* at 29-30. Petitioner has also requested $2,499.78 for past unreimbursed medical expenses and $1,648.00 in alleged lost wages for two weeks of missed work. *Id.* at 26.

In contrast, Respondent argues that the facts and circumstances in the instant case are less severe than those in *Kestner* and cites to three other cases he argues are better comparables: *Shelton* (awarding $97,500.00)*, Wylie* (awarding $108,000.00)*, and Brandt* (awarding $65,000.00).[5] Respondent has also indicated that he agrees with the requested amount of unreimbursed medical expenses, but does not believe Petitioner is entitled to any compensation for lost wages because she has failed to substantiate that

---

[4] *Kestner v. Sec'y of Health & Hum. Servs.*, No. 20-25V, 2023 WL 2447499 (Fed. Cl. Spec. Mstr. Mar. 10, 2023).

[5] *Shelton v. Sec'y of Health & Hum. Servs.*, No. 19-279V, 2021 WL 2550093 (Fed. Cl. Spec. Mstr. May 21, 2021); *Wylie v. Sec'y of Health & Hum Servs.*, No. 20-1314V, 2022 WL 17968929 (Fed. Cl. Spec. Mstr. Dec. 7, 2022); *Brandt v. Sec'y of Health & Hum. Sevs.*, No. 21-494V, 2022 WL 2663245 (Fed. Cl. Spec. Mstr. June 14, 2023).

7

request. Resp. at 18. In her reply, Petitioner reiterates her belief that her cited case stands as appropriate comparable to the instant case.

### A. Legal Standards for Pain and Suffering Awards

In another decision, I discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within SPU. I fully adopt and hereby incorporate my prior discussion in Sections II and III of *Friberg v. Sec'y of Health & Hum. Servs.*, No. 19-1727V, 2022 WL 3152827 (Fed. Cl. Spec. Mstr. July 6, 2022).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[6]

### B. Appropriate Compensation for Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury. In determining appropriate compensation for pain and suffering, I have carefully reviewed and taken into account the complete record in this case, including, but not limited to: Petitioner's medical records, signed affidavits, filings, and all assertions made by the parties in written documents and at the expedited hearing held on February 28, 2025. I have also considered prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and relied upon my experience adjudicating these cases. However, my determination is ultimately based upon the specific circumstances of this case.

Pursuant to my oral ruling on May 30, 2025 (which is fully adopted herein), **I find that $105,000.00 represents a fair and appropriate amount of compensation for Petitioner's pain and suffering.**

---

[6] *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

In making this determination, I have considered the mild-to-moderate nature of Petitioner's left shoulder pain and limited ROM and her good prognosis post-surgery, particularly her quick recovery. Prior to surgery, Petitioner consistently reported pain ranging from 4/10 at best to 6/10 at worst and limited range of motion in her left shoulder. With the aid of PT, Petitioner was able to reduce her pain levels to 2-3/10. However, when the pain did not completely subside, her doctors ordered an MRI. The results of this MRI confirmed the need for surgical intervention. Post-surgery, Petitioner initially reported pain levels of 3/10 at best and 5/10 at worst. Following 20 more sessions of PT, Petitioner was able to demonstrate full ROM and strength in her left arm. Although Petitioner has indicated in her affidavit that she still experiences some pain in her shoulder to this day, it does not appear severe enough to interfere with Petitioner's daily life activities, and Petitioner has not had to seek additional treatment for pain management. Also notable is the fact that Petitioner never had to receive any steroid injections in her left shoulder to help with pain management.

Thus, the overall severity of the SIRVA in the instant case was not high enough to warrant $125,000.00 in damages. In *Kestner* (the sole comparable decision offered by Petitioner), a claimant was awarded the lesser sum of $115,000.00. Petitioner has argued that her case is more severe than *Kestner*, given the MRI findings and the fact that her surgery was more extensive. Br. At 29. However, my review of the cases actually suggests *Kestner* overall involved a more severe injury. The *Kestner* petitioner reported similar levels of pain prior to surgery and ultimately recovered in a similar amount of time, but underwent 29 post-surgery PT sessions and required additional medical intervention for intermittent shoulder pain rated at 2-4/10, including requiring a prescription for a Medrol dosepak. *Kestner,* 2023 WL 2447499, at *6. Although Ms. Bright's surgery may have ultimately been more extensive, the facts do not indicate that she suffered more prior to surgery, and she required less treatment and PT post-surgery.

It is ultimately Respondent's cited case of *Wylie* that provides the best comparable to the instant case. Indeed, *Kestner* cites to *Wylie* as the most reasonable comparable case due to the reported pain levels, number of PT sessions, one surgery, and an overall excellent recovery following this treatment. *Id.* Ultimately, the *Kestner* petitioner was awarded more than the *Wylie* petitioner due to more post-surgery PT, ongoing symptoms which required additional treatment, and the particular impact her injury had on her personal and professional life. *Id.*

As previously stated, Ms. Bright's injury was less severe than in *Kestner*. However, Ms. Bright's injury is very comparable to the one in *Wylie*. That individual had 14 PT sessions prior to surgery versus 7 sessions for Ms. Bright. Following surgery, the *Wylie* petitioner had 18 PT sessions compared to 20 for Ms. Bright. Neither claimant required a steroid injection to manage their pain, and both petitioners have reported a nearly full

9

recovery with only occasional mild pain with activity. However, in additional to more PT overall, the *Wylie* petitioner also reported higher maximum pain levels in her shoulder of 8/10 compared to 6/10 for Ms. Bright. Ultimately, the *Wylie* petitioner was awarded $108,000.00 in pain and suffering for her SIRVA. Due to the largely similar, although *slightly* less intensive course of treatment and severe pain levels, Ms. Bright's injury should be awarded slightly less than *Wylie.*

Respondent's other cited cases, *Shelton* and *Brandt*, are less helpful. *Shelton* is distinguishable due to the amount of time, approximately eight months, that the petitioner delayed before seeking treatment for arguably a more severe overall injury than is in the instant case, and this treatment gap was the primary reason for the pain and suffering award of $95,000.00, lower than I have typically awarded in SIRVA cases requiring one surgery. And *Brandt* is a case in which the petitioner did not even undergo surgery. Although Respondent attempts to compare the clinical course of the *Brandt* petitioner to Ms. Bright's case, the fact that the *Brandt* Petitioner was able to recover utilizing PT alone renders the case inapposite.

### C. Appropriate Compensation for Lost Wages

Petitioner has requested $1,648.00 in lost wages because it is alleged that she had to miss two weeks of work following her shoulder surgery on March 21, 2019. Respondent has opposed this amount, arguing that Petitioner has failed to adequately document this lost income because she has not submitted any evidence showing she missed work or was not paid by her employer in the two weeks following her surgery.

At the Motions Day hearing, Petitioner acknowledged she could offer no additional evidence supporting Petitioner's claim for lost wages. I thus have determined that lost wages would not be awarded for failure to substantiate this damages element.

### Conclusion

For all the reasons discussed above and based on consideration of the entire record, **I find that Petitioner's left shoulder injury meets the definition for a Table SIRVA. Thus, causation is presumed, and Petitioner is entitled to compensation in this case. Furthermore, I find that $105,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.[7] Finally, pursuant to the agreement of the parties, I find that $2,499.78 represents a fair and**

---

[7] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

**appropriate amount of compensation for Petitioner's out-of-pocket unreimbursed expenses.**

Based on the record as a whole and arguments of the parties, **I award Petitioner a lump sum payment of $107,499.78, representing compensation for her actual pain and suffering and out-of-pocket unreimbursed expenses to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a) of the Vaccine Act. *Id.*

This amount represents compensation for all damages that would be available under Section 15(a). The Clerk of the Court is directed to enter judgment in accordance with this Decision.[8]

**IT IS SO ORDERED.**

                                       **s/Brian H. Corcoran**
                                       Brian H. Corcoran
                                       Chief Special Master

---

[8] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.